## PEOPLE v. TRANSIT DEVELOPMENT CO.

(Supreme Court, Appellate Division, Second Department.　March 5, 1909.)

1. NUISANCE (§ 65*)—LEGISLATIVE AUTHORITY.

Where legislative authority is pleaded as a defense to an indictment for public nuisance, the act must have been within the contemplation of the Legislature, and either expressly or by necessary implication permitted by it.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 158, 159, 170, 171; Dec. Dig. § 65.*]

2. EMINENT DOMAIN (§ 69*)—COMPENSATION.

Where the Legislature authorizes a thing to be done which may cause injury to private persons, it cannot be supposed that it is intended to be done without making compensation; and where permission is given to a corporation having the right of eminent domain, it must be supposed that the intention is that it shall acquire the necessary rights by the exercise of that power, if not by contract.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 171–179; Dec. Dig. § 69.*]

3. NUISANCE (§ 65*)—POWER PLANTS—LOCATION—LEGISLATIVE AUTHORITY.

The Legislature having authorized the construction and operation of electric railroads in the borough of Brooklyn, it thereby authorized the location of power plants where they might cause possible annoyance or discomfort to private persons; and, though this did not permit the taking of private property without compensation, it prevented such plants from being a public nuisance.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 158, 159, 170, 171; Dec. Dig. § 65.*]

4. NUISANCE (§ 59*)—"PUBLIC OR COMMON NUISANCE."

A "public or common nuisance" is that which affects the public and constitutes an annoyance to all; a thing which in its nature or its consequences is a nuisance, an injury or a damage to all persons who come within the sphere of its operation, though in greater or less degree. It is public when it affects the rights enjoyed by citizens as a part of the public, as the right of navigating a river, or traveling on a public highway, etc.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 135, 136; Dec. Dig. § 59.*

For other definitions, see Words and Phrases, vol. 6, pp. 5799–5804.]

5. NUISANCE (§ 1*)—"PRIVATE NUISANCE."

A "private nuisance" is something which injures or annoys the lands, tenements, or hereditaments of another.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 6, pp. 5574–5576.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. NUISANCE (§ 72*)—PUBLIC NUISANCE—RIGHT TO SUE.

A private person cannot prosecute a suit for a public nuisance, unless the nuisance affects the comfortable enjoyment of private property and the owner suffers injury different in kind from that suffered by the public, when he may sue, though a considerable number may be injured by the same act.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. § 164; Dec. Dig. § 72.*]

7. NUISANCE (§ 4*)—PRIVATE NUISANCE—GIST OF ACTION.

In a suit for an alleged private nuisance caused by the carrying on of a lawful business, the gist of the action is whether the use made by defendant of his premises is reasonable with regard to the time, place, and circumstances; the extent more than the nature of the injury being regarded as constituting the actionable injury.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 26–34; Dec. Dig. § 4.*]

8. NUISANCE (§ 92*)—PUBLIC NUISANCE—PROSECUTION—EVIDENCE.

Defendant corporation maintained an electric power plant in the vicinity of a gas and other manufacturing plants, where large quantities of coal were burned daily. Defendant was indicted for maintaining a public nuisance, resulting from the fact that small flakes or particles of hard coal were emitted from its smokestacks and fell on passers-by and were blown or sifted into the houses within a given radius. Held, that defendant was entitled to prove the incorporation of the railroads comprising the Brooklyn rapid transit system, the relations existing between defendant and such system, that the transit company owned all of defendant's stock, that defendant sold power only to such company at cost, and that it was not practicable for the company to get power elsewhere, in order to establish that the public inconveniences resulting from the shutting down of defendant's plant would so outweigh these inconveniences to the public as to prevent defendant's conviction.

[Ed. Note.—For other cases, see Nuisance, Dec. Dig. § 92.*]

Appeal from Kings County Court.

The Transit Development Company was convicted of maintaining a public nuisance, in violation of Pen. Code § 385, and it appeals. Reversed.

Argued before WOODWARD, JENKS, GAYNOR, and MILLER, JJ.

Edward W. Hatch (George D. Yeomans and Charles L. Woody, on the brief), for appellant.

Robert H. Elder (John F. Clarke, Dist. Atty., on the brief), for the People.

MILLER, J. The defendant is a domestic corporation, organized under the business corporations law (Laws 1890, p. 1167, c. 567), for the purpose, among others, of carrying "on business of general contractors, including the contracting with other corporations and persons for the supply of power or for the construction, equipment or improvement of railroads, bridges, wharves, tunnels and subways and to carry out such contracts." It maintains an electric power plant on the river front at Kent and Division avenues in the borough of Brooklyn. The people's evidence tends to show that small flakes or particles of hard coal are emitted from its smokestacks, fall upon passers-by, and are blown or sifted into the houses within a given radius. A gas plant

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

across the street and other manufacturing plants in the vicinity burn large quantities of coal daily. The defendant's evidence tends to show that its plant was suitably located, was equipped with the best up to date devices, and was properly run; that, not being permitted to burn soft coal, it burned the only other coal commercially practicable for it to use; and that at the time of the trial it was installing at large expense a device which, though new for that use, was expected greatly to reduce, if not entirely to prevent, the emission of cinders from its smokestacks. It offered in evidence the certificates of incorporation of the railroad companies comprising the Brooklyn rapid transit system, and it offered evidence tending to prove the relations existing between them and it, that the Brooklyn Rapid Transit Company owned all of its capital stock, that it sold power only to them, and at cost, and that it was not practicable for them to get the power elsewhere. All of that evidence was excluded.

The defendant contends that the railroad corporations have legislative permission to maintain at suitable and convenient places the necessary power plants to run their roads, that they may contract with another to do that for them, and that the permission given them devolves on the one with whom they contract. The learned district attorney contends that, as the Legislature has not expressly authorized this particular plant to be run at the place and in the manner disclosed, neither the defendant nor the railroad companies have permission to run it. While there are expressions in some opinions, not necessary to the point actually involved, tending to support the proposition contended for by the district attorney, no case is cited expressly holding that to be the law of this state; but the contrary has been decided. The actual authority for the proposition is the case of Managers, etc., v. Hill, 4 L. R. Q. B. 433; Id., 6 L. R. App. Cas. 193. The reason for the decision in that case was the absence of any provision in the act for compensation to persons whose rights should be invaded, which was regarded, as expressed by Lord Blackburn, as "a reason, though not a conclusive one, for thinking that the intention of the Legislature was, not that the thing should be done at all events, but only that it should be done, if it could be done, without injury to others." But our Legislatures, unlike Parliament, are subject to constitutional limitations, and are powerless to authorize a taking of private property, even for a public purpose, without making compensation. Muhlker v. Harlem R. Co., 197 U. S. 544, 25 Sup. Ct. 522, 49 L. Ed. 872.

The question as to what constitutes a taking and what results only in consequential damages is not material to the present discussion. When our Legislature authorizes a thing to be done which may cause injury to private persons, it cannot be supposed that it was intended to be done without making compensation; and, where permission is given a corporation having the power to take property by the right of eminent domain, it must be supposed that the intention was that it should acquire the necessary rights by the exercise of that power, if not by contract. At any rate, the reason for requiring explicit authority of Parliament for the particular act does not apply in this country. However, it is undoubtedly the law that the act, for the doing of which legis-

lative authority is claimed, must have been within the contemplation of the Legislature, and either expressly or by necessary implication permitted by it. Cogswell v. N. Y., N. H. & H. R. R. Co., 103 N. Y. 10, 8 N. E. 537, 57 Am. Rep. 701; Bohan v. P. J. G. L. Co., 122 N. Y. 18, 25 N. E. 246, 9 L. R. A. 711; Morton v. Mayor, 140 N. Y. 207, 35 N. E. 490, 22 L. R. A. 241; Booth v. R., W. & O. T. R. R. Co., 140 N. Y. 267, 35 N. E. 592, 24 L. R. A. 105, 37 Am. St. Rep. 552; Garvey v. L. I. R. R. Co., 159 N. Y. 323, 54 N. E. 57, 70 Am. St. Rep. 550; D., L. & W. R. R. Co. v. City of Buffalo, 158 N. Y. 266, 53 N. E. 44; Sadlier v. City of New York, 104 App. Div. 82, 93 N. Y. Supp. 579, 185 N. Y. 408, 78 N. E. 272. It should be observed that those were all private suits.

Public, not private, rights are involved in this case. There can be no doubt that the railroad corporations have legislative permission to do what is necessary for the running of their roads in the city (now borough) of Brooklyn, for that has been expressly decided. Brooklyn Heights R. R. Co. v. City of Brooklyn, 152 N. Y. 244, 46 N. E. 509. See, also, Bennett v. L. I. R. R. Co., 181 N. Y. 436, 74 N. E. 418; Friedman v. N. Y. & H. R. R. Co., 89 App. Div. 38, 85 N. Y. Supp. 404. When the Legislature authorized the organization of corporations to construct and operate electric roads in cities, it of course contemplated the construction of such roads as exist in the borough of Brooklyn. In view of the location of this city and of its rapid growth, it must have been within the contemplation of the Legislature that power plants would have to be located where possible annoyance or discomfort to private persons might be caused. That did not authorize the taking of private property without making compensation, but it prevented the thing authorized from being a public nuisance. See People v. N. Y. Gaslight Co., 64 Barb. 55. In Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 108 U. S. 317, 2 Sup. Ct. 719, 27 L. Ed. 739, the court, per Mr. Justice Field, quoted with approval from Sinnickson v. Johnson, 17 N. J. Law, 151, 34 Am. Dec. 184, the following:

"It may be lawful for him [the grantee of the power] and his assignees to execute this act, so far as the public interests, the rights of navigation, fishing, etc., are concerned, and he may plead, and successfully plead, the act to any indictment for a nuisance, or against any complaint for an infringement of the public right, but cannot plead it as a justification for a private injury which may result from the execution of the statute."

However, the defendant has been endowed only with the powers which any individual may exercise, and can claim from its certificate of incorporation no greater rights. It is a mere accident that the railroads are its only customers, if that be the fact. A right, specially granted to a quasi public corporation, cannot be devolved by it upon an individual. It must be presumed that the Legislature intended that the right should be exercised by the one to whom it was granted. Permission to own and run the entire system might as well be devolved as permission to own and run any part of it. The railroads could have acquired, under the power of eminent domain, the site for this power plant and the property rights infringed by its maintenance, a cogent reason for thinking that the railroads have legislative permission to

maintain it. But the defendant had no such power, and there is as much reason for saying that the power of eminent domain to acquire the site could be devolved as that the permission to maintain the plant upon the site when acquired could be.

The cases of Benner v. A. D. Co., 134 N. Y. 156, 31 N. E. 328, 17 L. R. A. 220, 30 Am. St. Rep. 649; Bates v. Holbrook, 171 N. Y. 460, 64 N. E. 181, and similar cases, are not in point. In those cases, the defendants contracted to do public work, directed by the Legislature to be done. They obtained their permission, not by devolution, but directly from the public authorities authorized to make the contract. Moreover, all of said corporations could not give the defendant the right to generate at one place the power which they might separately have the right to generate at different places. Of course, we are not advised of what the proof might show respecting the right of the Brooklyn Rapid Transit Company to operate the entire system as one road or what the fact respecting such operation may be; but, in any view of the case the defendant cannot shield itself behind legislative permission. However, it does not follow that the said evidence was properly excluded.

It is important at this point to observe the distinction between public and private nuisance. Blackstone defines "public or common nuisances" to be those "which affect the public, and are an annoyance to all the king's subjects," and "private nuisances" to be "anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another." A public nuisance is a thing which "in its nature or its consequences is a nuisance, an injury or a damage to all persons who come within the sphere of its operation, though it may be in greater or less degrees." Soltau v. De Held, 9 Eng. L. & E. 104–111. A nuisance is public "when it affects the rights enjoyed by citizens as part of the public, as the right of navigating a river or traveling on a public highway, rights to which every citizen is entitled." King v. Morris & Essex R. R. Co., 18 N. J. Eq. 397–399.

Upon first examination of sections 385 and 386 of the Penal Code, it may seem that the Legislature intended to change the law. Those sections are taken from sections 430 and 431 of the draft Code, prepared by the Field Commission and submitted to the Legislature in 1865. It is evident from the report of the commission that they intended only to codify and harmonize existing laws. The four subdivisions of section 430 are supported by a note, containing numerous citations, and in the note to section 431 the reason for substituting the words "a considerable number of persons" for the words "the whole community or neighborhood," found in section 1572 of the draft Civil Code, then prepared, was stated to be to avoid uncertainty; and it was said:

"It may be doubtful in some cases whether the persons affected by an obstruction in a navigable stream, for instance, form what can be called a neighborhood"

—thus showing the intention to retain the idea of a common nuisance, as distinguished from private nuisances, suffered by a determinate number of persons. The first sentence of said section 385 is:

"A public nuisance is a crime against the order and economy of the state."

The Court of Appeals, per Martin, J., say, in Ackerman v. True, 175 N. Y. 353–360, 67 N. E. 629, 630:

"It is well established by the decisions of this court that interferences with public and common rights create a public nuisance."

It is elementary that a private person cannot prosecute a suit for a public nuisance; though he may suffer injury, it is common to the public, and can only be redressed by the state, either by indictment or by a suit to abate the nuisance; though, where an individual suffers peculiar or special damage, not common to the public, the nuisance is as to him private, and he may have his action for damages, or, in a proper case, may invoke the equity power of the court. See Doolittle v. Supervisors, 18 N. Y. 155–160; Kavanagh v. Barber, 131 N. Y. 211–213, 30 N. E. 235, 15 L. R. A. 689; Ackerman v. True, supra. For the interference with the comfortable enjoyment of their homes, for the injury to their property, the owners thereof have an appropriate remedy, if there be a nuisance; but as to each of them the nuisance is private, and does not become public merely because a considerable number may be injured; for, otherwise, it would follow that, in case of special injury to each of a considerable number, no private suit could be maintained. Hence, while the evidence of annoyance and discomfort to those dwelling in the vincinity of the alleged nuisance was relevant, the case has to be considered solely from the aspect of the public or common rights invaded.

It is necessary now to consider whether and to what extent the doctrine of compensation applies. The question appears to have been given more consideration by the courts in England than in this country. The Court of Kings Bench, in the case of Rex v. Russel, 6 Barn. & Cress. 566, held, Lord Tenterden, C. J., dissenting, that the question whether the public benefit countervailed the prejudice done to individuals was properly submitted to the jury in the trial of an indictment for maintaining a public nuisance. The alleged nuisance in that case consisted of an obstruction in the river Tyne, caused by staiths erected for the loading of ships with coals, plainly a case of an invasion of public and common rights. The public benefit was the remote and indirect benefit supposed to result from the improved quality and cheaper price of the coals, because they could thus be loaded in better condition and at less expense. That case was disapproved in King v. Ward, 4 Ad. & Ell. 384, also a case of the obstruction of a navigable stream. But the judgment of Lord Denman, C. J., shows that the doctrine of compensation was not rejected, but that only advantages closely connected with the inconveniences resulting, not remote and indirect benefits alone, could be considered. In 1858 the Court of Common Pleas held, in a private suit, that the business of brick burning, being a necessary and useful trade for the building of houses, could not constitute a private nuisance if carried on in a reasonable manner and in a proper and convenient place. Hole v. Barlow, 4 C. B. [N. S.] 334. That case was overruled by the Court of Exchequer Chamber in Bamford v. Turnley, 31 L. J. (N. S.) Q. B. 286, but upon the ground, as shown by the judgment of Baron Bramwell, that supposed public

benefit could not justify the infliction of loss upon an individual without compensation. That case was followed in Cavey v. Lidbetter, 32 L. J. (N. S.) Q. B. 104; but the judgment of Erle, C. J., shows that, while a private nuisance from a lawful trade could not be justified by convenience of place alone, the jury were entitled to consider all of the circumstances in respect of time, place, manner and degree, in determining whether actionable discomfort was made out. He said:

"It seems to me that life, in a dense neighborhood, cannot be carried on without mutual sacrifices of comfort, and that in all actions for discomfort the law must regard the principle of mutual adjustment; and the notion that the degree of discomfort which might sustain an action under some circumstances must therefore do so under all circumstances is as untenable as the notion that the act complained of, if done in a convenient time and place, must therefore be justified, whatever was the degree of annoyance that was occasioned thereby."

The judgments given in the House of Lords in the case of St. Helens Smelting Co. v. Tipping, 35 L. J. (N. S.) 66, are instructive. That was a suit for a private nuisance, a direct injury to property from smelting works. The Lord Chancellor distinguished the case of material injury to property from that of mere personal discomfort, and in respect of the latter said:

"If a man lives in a town, of necessity he should subject himself to the consequences of those operations of trade which may be carried on in his immediate locality, which are actually necessary for trade and commerce; also for the enjoyment of property, and for the benefit of the inhabitants of the town and of the public at large."

In this state, in suits for alleged private nuisance, caused by the carrying on of a lawful business, the question is whether the use made by the defendant of his premises is reasonable, regard being had to time, place, and circumstance. Booth v. R., W. & O. T. R. R. Co., 140 N. Y. 267, 276, et seq., 35 N. E. 592, 24 L. R. A. 105, 37 Am. St. Rep. 552; McCarty v. Nat. Carbonic Gas Co., 189 N. Y. 40, 81 N. E. 549, 13 L. R. A. (N. S.) 465. In the last case cited, Judge Vann, after reviewing the authorities, said:

"The extent more than the nature of the injury, the quantum rather than the damnum, constitutes the nuisance. Some smoke is generally created by the natural and ordinary use of land near a city or village, and while this may sometimes be annoying to neighbors it is part of the price paid for living where there are neighbors. But when the smoke is so unusual and excessive as to materially interfere with the ordinary comfort of human existence, *the trior of the facts, taking into account all the circumstances, such as public utility, locality, immediate surroundings, and the like, may find the use unreasonable.*" (Italics are mine.)

It seems that in a private suit the evidence excluded in this case would be considered by the court in determining whether an injunction should be granted or only money damages allowed. Riedeman v. Mt. Morris El. L. Co., 56 App. Div. 23, 67 N. Y. Supp. 391. And see Grey v. Simmons, 60 N. J. Eq. 385, 45 Atl. 995, 48 L. R. A. 717, 83 Am. St. Rep. 642, and Commonwealth v. Miller, 139 Pa. 77, 21 Atl. 138, 23 Am. St. Rep. 170.

The question of the right to consider the public advantage in determining whether there is a public nuisance has been decided by the

Court of Appeals in a suit instituted by the Attorney General to compel the abatement of an alleged nuisance, the maintaining of a floating elevator in the City Ship Canal of Buffalo. In that case judgment for the plaintiff was reversed by the General Term, and the reversal was sustained by the Court of Appeals. In the course of his opinion, Judge Allen, speaking for the court, said:

"The employment being lawful, the question was directly presented whether the slight obstructions resulting from the means used were not more than balanced by the public benefits and the facilities rendered to the commerce of the canal and of the city, and it was error to refuse to consider them." People v. Horton, 64 N. Y. 610.

My conclusions from the foregoing authorities are that in a private suit the evidence excluded in this case would be relevant to the issue of whether the defendant was making a reasonable use of his property; that, even though a technical nuisance were made out, it could be considered by the court in an injunction suit on the question whether the public harm to result from shutting down the plant would not so outweigh the slight benefit to individuals as to justify the withholding of injunctive relief; and that, in a public prosecution, the evidence is admissible to prove that the public inconveniences were absorbed in the greater public advantages directly resulting.

The defendant was indicted for an injury to the public, and was entitled to show the public benefit directly resulting from the act charged. It must not be overlooked that questions of injury to private property, to be redressed at the suit of the owners thereof, are eliminated from the present discussion. We are dealing only with the personal discomforts suffered by all the public who happen to be in the vicinity of this power house, and the defendant was entitled to prove that the inconveniences from particles of hard coal in the air to passers-by in the street, for instance, were more than counterbalanced by the immediate advantage to them and the entire public from the power generated by the defendant to run the electric roads. The excluded evidence may have shown that the Brooklyn Rapid Transit Company could have shielded itself from public prosecution for the maintenance of this power plant by legislative authority. While, in law, the defendant, though owned by that company, has a distinct identity, the jury were entitled to know that it was only doing for the said company what the latter had the right to do. The street railroads of this city are a public necessity. While the defendant may not have legislative permission to run this power plant in the sense in which that term is now used, it does have the right to engage in the lawful business of supplying the street railroads with power, and mere discomfort arising therefrom to individuals, which is only incidental—indeed, it may be said necessary—to the existence of this great city, does not justify a public prosecution. Absolute rights cannot exist in organed society, and the denser the population, the greater the city, the more the rule of give and take, of mutual sacrifice, comes in play. Discomforts have to be borne in return for the advantages and conveniences of city life. Those living in manufacturing districts have to submit to what would not be allowed in strictly residential neighborhoods, and, in the mutual adjustment of things, find compensation in various ways.

The defendant respects the city ordinance and burns hard coal. This, when subjected to the intense heat of its furnaces, flakes off, and particles escape through its smokestacks. These particles may be an annoyance, but they certainly are not more unsanitary than many foreign substances found in the air everywhere in a crowded city. To many the odors from the gas plant across the street from the defendant's plant would be more offensive, and perhaps more harmful, than the particles of coal. There are few reported cases in this state of public prosecutions for nuisance resulting from lawful trade or business, and such cases may well be left to be redressed at the suits of individuals specially injured. The trades usually referred to in the books as indictable at common law were the tallow candlers', the tanners', and the like trades. The defendant is not contaminating the air with noisome and noxious vapors and gases, nor can it just as well conduct its business in some remote place. The place selected by it appears to be as suitable as any that could be selected; at least, a jury would probably think so. It was a question of fact upon the evidence whether the business could be conducted without the emission of cinders from the smokestacks. With the excluded evidence in the case, it might be a question whether the maintenance of this power plant, or one like it in some similar place, was necessary to the running of the railroads. But, if those questions should be resolved in favor of the defendant, it cannot be credited that a jury of this city, properly instructed, would convict the defendant of maintaining a public nuisance, merely because particles of hard coal in place of black smoke were emitted from its smokestacks.

The judgment is reversed. All concur.